UNITED STATES, Appellee

v.

JAMES L. QUISENBERRY, Sergeant, U. S. Army, Appellant

1 USCMA 670, 5 CMR 98

LT. COL. George M. Thorpe, USA, and 1ST LT. William K. Vanderbilt, USA, for Appellant.

LT. COL. Paul J. Leahy, USA, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Petitioner was tried by a general court-martial at Taegu, Korea, for the unpremeditated murder of a Korean youth in violation of Article of War 92, 10 USC § 1564. He was found guilty and sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances and to be confined at hard labor for a period of ten years. The convening authority and the board of review approved the findings and sentence. Pursuant to Article 67(b)(3), 50 USC § 654, petition for review was filed in this Court by the petitioner, and we granted the petition to pass on the question of whether the failure of the law officer to instruct as to the elements of any lesser included offense constituted error prejudicial to his substantial rights.

The events which brought about this prosecution began across the river from Sinchon Dong, Taegu, Korea. There, petitioner, after having consumed some Korean liquor and after having finished his day's work as a crane operator, obtained a ride into Sinchon Dong. The driver transported petitioner into the village, and dropped him off on a street where there were a number of children playing. Petitioner took an M–1 rifle which he was carrying and fired a shot into the air, apparently to attract attention for he then asked one of the Korean children the location of the home of a Korean known as OK Hi. He, having been directed to OK Hi's house by the child, entered, found no one home

and shortly thereafter reappeared. Upon coming out of the house it was noticed that he was carrying two blankets under his left arm and the rifle in his right hand. The street was narrow and lined with shacks. A number of Korean boys gathered around the petitioner as he was leaving and without any apparent reason petitioner raised the rifle to his shoulder, fired and struck one of the boys in the head killing him instantly. He then fled but was later taken into custody.

The shot was heard across the river by the truck driver, and another soldier named Fralin. Both immediately drove to a nearby hill, presumably where they could determine the reason for the firing. Fralin left the truck and hurried down the hill and caught up with petitioner. While Fralin was disarming him, another round was fired from the rifle. Fralin succeeded in getting possession of the weapon and it was turned over to the driver who removed four rounds and an empty cartridge.

That same evening, the rifle was test fired by a CID agent who determined that the gun malfunctioned in that expended cartridges had to be ejected manually. He did not give the gun a thorough examination for other possible faults but noticed that the trigger pull was normal.

Petitioner, who testified in his own behalf, related a somewhat different version of the day's events. He stated that he had been drinking during the day in question and was "pretty tight" when he arrived in Sinchon Dong; that

**671**

while he hurried—double-timed as he put it—as he left the house, he did so only because he heard a horn blowing; that he thought the horn was a signal calling him back to his truck; that when he left the house he had the rifle on his left shoulder and the blankets under his left arm; that he was in the process of shifting the gun from his left to right shoulder when it discharged; that the muzzle of the gun was always pointed upward; that he did not touch the trigger, firing mechanism or the stock or barrel of the rifle; and that he did not intend to hurt anyone as he had no occasion to do so.

The specification under the charge reads as follows:

"In that Sergeant James L. Quisenberry . . . did, at Sinchon Dong, Taegu, Korea, on or about 28 May 1951, with malice aforethought, willfully, feloniously, and unlawfully kill Kim Tae Chin, a human being, by shooting him with a rifle."

After presentation of all the evidence and defense's argument, the law officer proceeded to instruct the court on the offense charged. Then having finished this portion of his instructions, he stated:

"Among the lesser offenses which may be included in a charge of murder are voluntary and involuntary manslaughter, attempt to commit murder and certain forms of assault."

Nothing more was said concerning the elements of the included offense so the question narrows to whether the evidence placed in issue any offense other than unpremeditated murder. The principle we have announced to guide law officers may be found in numerous cases but it bears repeating. We stated in the case of United States v. Clark (No 190), 1 USCMA 201, 2 CMR 107, decided February 29, 1952, and again in United States v. Roman (No 191), 1 USCMA 244, 2 CMR 150, decided March 19, 1952, that:

". . . Included offenses are charged within the principal charge, and it is consistent with the Code and with the Federal civilian practice to require that they must be defined in

**672**

instructions, *subject to the well-established rule that there must be some evidence from which a reasonable inference may be drawn that the lesser included offense was in issue.*" [Emphasis supplied]

We, therefore, test the evidence to determine if that rule required instructions on lesser included offenses. Voluntary manslaughter is defined in the Manual for Courts-Martial, U. S. Army, 1949, as being a homicide caused by an act likely to result in death, intentionally committed in the heat of passion brought about by provocation. The record is barren of any evidence of acts by deceased or others, preceding or at the time of the incident, which could be construed as provocative. Petitioner specifically rejected any reference that he was angry, offended by anyone or provoked. The state of the evidence thus eliminated any necessity for an instruction on voluntary manslaughter.

Involuntary manslaughter offers a more difficult problem. It is defined by the same Manual as being a homicide unintentionally caused in the commission of an unlawful act not inherently dangerous to human life *or* by culpable negligence in performing a lawful act or an act required by law. If we consider the evidence produced by the Government, we find that petitioner deliberately raised his rifle to his shoulder and fired a shot directly into the head of a boy who was only a short distance away. There appeared to be no reason, justification or excuse for so doing. Without a doubt the picture painted by the Government witnesses shows a malicious, wilful and unjustifiable homicide clearly sufficient to sustain the finding returned.

As we view petitioner's evidence, it admits the killing but seeks to excuse it on the theory that the homicide was the result of misadventure, mishap or accident. He sought to establish his defense by showing that he was carrying a defective and malfunctioning weapon which he had borrowed that morning; that it fired accidentally twice, once when the boy was killed and the second time when the weapon was being taken by Fralin; that the rifle was not aimed;

that the muzzle was always pointed skyward; that in changing the rifle from his left to his right shoulder he took hold of the upper part of the sling; that he did not touch the trigger nor any part of the gun itself; and that the weapon fired solely because of its defective condition.

We shall cast aside that part of petitioner's story which is impossible and assume that as he moved the gun from one shoulder to another the weapon was discharged at a time when it was inadvertently pointed toward the boy. Even when we make that assumption, the only issues reasonably inferable from the evidence are that the petitioner either wilfully caused the death of the boy or that his death was, as petitioner contends, an accident resulting from mishap or misadventure. Regardless of which view of the evidence we take, there is no testimony of (1) a homicide unintentionally caused in the commission of an unlawful act, not inherently dangerous to human life; or (2) culpable negligence in performing a lawful act. As to the former, the evidence produced by the Government shows, as previously stated, a wilful taking of life; that produced by the accused; an unintentional homicide without any unlawful act. We can summarize his contention at trial, and this is consistent with his testimony, as follows: It was not unlawful to carry a loaded weapon in Korea; he did not know it was loaded or that it was defective; he merely moved it from one shoulder to another; it was not aimed nor carelessly fired; and he cannot account for why it was discharged. Under any reasonable construction of the evidence given by the petitioner, if we assume its truthfulness, we could not conclude that his acts were unlawful.

Under the second arm of the definition the evidence for the Government does not fit and neither does that for the petitioner. The carrying of the weapon was legal but we find no testimony of culpable negligence. The petitioner testified that he did not fire the weapon and there is no evidence that could charge him with knowledge that it might unsuspectingly fire because it was defective. Again, if we accept his contention, petitioner did no more than change his weapon from one shoulder to another, ignorant of the rifle's characteristics. Accordingly, if the rifle fired because of the mere handling, we not only cannot find culpable negligence, we cannot find ordinary negligence. We are at a loss to determine how we can mold together any combination of facts related by the petitioner and conclude that, as a matter of law or fact, they raised any issue of involuntary manslaughter.

What we have just stated disposes of any of the other lesser included offenses. Where the act resulting in death was caused by accident and the homicide is by misadventure, the killing is excusable. Moreover, we believe it abundantly clear that this case presents a factual dispute, in which the related versions are poles apart, and that there was no requirement which demanded that a law officer disbelieve both versions and instruct on other speculative offenses. Issues are not created in the abstract; they are brought into existence by the evidence. In this connection, we emphasize the fact that we are here dealing with the necessity of giving instructions on elements of included offenses, not in what findings a court-martial might return, and that, in weighing the evidence, we consider its posture as presented to the law officer. We do not consider it from the viewpoint of an ultimate factfinder. It may well be that a court can disregard the evidence and instructions and arrive at a compromise verdict which may not be prejudicial to the accused, but the possibility of this result should not concern the law officer when he is formulating and giving his instructions. Unless there is some evidence from which a reasonable inference may be drawn that a lesser included offense is in issue, there is no requirement on his part to instruct. We find in this case that the law officer instructed in accordance with that rule and that the petitioner was not entitled to an instruction on the elements of any included offenses.

The decision of the Board of Review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.